


UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| TIM ANDERSON, individually and as Natural Guardian of A.A., a minor, | \* | CIV 00-1008 |
| | \* | **2000 D.S.D. 49** |
| Plaintiff, | \* | |
| -vs- | \* | ORDER |
| MILBANK SCHOOL DISTRICT 25-4, a Political Subdivision under the laws of the State of South Dakota, | \* | |
| Defendant. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**KORNMANN, UNITED STATES DISTRICT JUDGE**

[¶1.]   This case, in general, is about a school rule prohibiting the use of any profane or inappropriate language on school property and the question of its constitutionality under the United States Constitution.

[¶2.]   The defendant school district ("Milbank") filed a motion for a summary judgment (Doc. 9) with a supporting brief, an affidavit from Milbank's high school principal, and the statement of material facts as required under D.S.D. LR § 56.1 (B). All these documents were served on plaintiff's attorney on September 29, 2000, and were filed on October 2, 2000. Pursuant to D.S.D. LR § 7.2 (A), the plaintiff had until October 23 to file a brief and a statement of material facts pursuant to D.S.D. LR § 56.1 (C). Plaintiff filed nothing, even to the present day. As a result, all portions of the "statement of material facts" filed by Milbank are deemed to be admitted. *See* D.S.D. LR § 56.1 (D). All these matters were brought to the attention of counsel by a memorandum issued by this Court on November 2, 2000. Counsel were advised that the telephonic pretrial conference scheduled for November 6 would be cancelled and that the Court would "under the present state of the record" issue a ruling based upon the motion filed. Counsel have not responded, sought to be relieved of default (in the case of the plaintiff), or sought to supplement the record.

[¶3.]   The summary judgment standard is well known and has been set forth by this Court in numerous opinions. *See* Hanson v. North Star Mutual Insurance Co., 1999 D.S.D. 34 ¶ 8, 71 F.Supp.2d 1007, 1009-1010 (D.S.D. 1999), Gardner v. Tripp County, 1998 D.S.D. 38 ¶ 8, 66 F.Supp.2d 1094, 1098 (D.S.D. 1998), Patterson Farm, Inc. v. City of Britton, 1998 D.S.D. 34 ¶ 7, 22 F.Supp.2d 1085, 1088-89 (D.S.D. 1998), and Smith v. Horton Industries, 1998 D.S.D. 26 ¶ 2, 17 F.Supp.2d 1094, 1095 (D.S.D. 1998).  Summary Judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Donaho v. FMC Corp., 74 F.3d 894, 898 (8th Cir. 1996).  The material facts are not in dispute.  Only legal issues are present before the Court.

[¶4.]   Milbank sets forth most school policies or rules in student handbooks distributed at the start of each school year.  One of the rules prohibited profane or inappropriate language on school property.  One prohibited being present where alcohol was being served.  One mandated a reduction in a student's grade if the student has an unexcused absence, subject to an opportunity to recover the grade reduction. Plaintiff's ward (hereinafter "student") received and read the handbook and knew about the policies and rules.  The student also knew that the consequences of violating the rule against profane or inappropriate language would be a suspension (in-school) which would result in unexcused absences which would in turn result in a two-percent reduction in grade for each class missed.  The rule as to profanity or inappropriate language on school property is not ambiguous, at least in the context of the present case.  Neither the student nor her parents have been directly impacted by the off-limits training rule; the student has never been accused of violating such rule.

[¶5.]   The student's mother works as a cook for Milbank.  In May of 1998, the mother left a note in the principal's office, telling the student to ride the bus home.  The message was not received until buses had already left.  Upon reading the note in the principal's office, the student said "shit."  The principal's secretary heard what the student said and told the student the matter would be reported to the principal.  It was and the principal met the next day with the student and her parents to explain the accusation and, if true, the penalties that would be imposed.  No objections were raised to the accusation or the planned penalties.  The student signed an acknowledgment of the nature of the violation and the punishment she faced.  The student

2

received a two and one-half day in-school suspension and a two percent reduction in her nine weeks grade for each class missed. This was exactly the punishment that had been explained in the rule and to the student and her mother in the meeting with the principal. These grade reductions turned out to mean nothing since they did not ultimately impact any semester grades that the student received. Semester grades are all that matter in Milbank.

[¶6.]   The student or her parents could have appealed the decision of the principal to the Milbank superintendent and could have requested a hearing before the superintendent or the school board. *See* SDCL 13-32-4.2. They did nothing to challenge the action of the principal other than bring the present action in federal court. The principal acted within the authority granted by SDCL 13-32-4.2 and under the authority of the Milbank school board. The statutory requirements as to the suspension were met. Due process requirements were met. The student could have not only appealed to the Milbank board but to the state circuit court from any adverse decision by the Milbank board and then to the South Dakota Supreme Court from any adverse decision by the circuit court. *See* SDCL 13-46-1, SDCL 13-46-6.8, and SDCL 13-46-7.

[¶7.]   The first question to be addressed is the matter of "standing." Standing is a threshold matter that, if absent, prevents this Court from exercising jurisdiction. Arkansas Right to Life State Political Action Comm. v. Butler, 146 F.3d 558, 560 (8th Cir. 1998). *See* Steel Co. v. Citizens for a Better Env't, 118 S. Ct. 1003, 1012-13 (1998) (holding that federal courts may not consider other issues before resolving standing, an Article III jurisdictional matter). The Constitution requires a party to satisfy three elements before such party has standing to bring suit in federal court and these three elements are injury in fact, causation, and redressability. *Id.* at 1016-17. The party invoking federal jurisdiction has the burden of establishing these three elements. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). The question of standing has nothing to do with the merits of the case in the abstract. Warth v. Seldin, 422 U.S. 490, 500 (1975), tells us that "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal."

[¶8.]   "Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in

the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked . . . The requirement of standing, however, has a core component derived directly from the Constitution. A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief. 454 U.S., at 472." Allen v. Wright, 468 U.S. 737, 751 (1983). It is clear to this Court that the plaintiff and his ward have no standing as to the issue of the "off limits training rules." As to such issue, the plaintiff and his ward have suffered no injury and there is therefore no standing; the court is without jurisdiction to even consider this aspect of this lawsuit. Milbank is entitled to summary judgment on this issue.

[¶9.]   The question of standing on plaintiff's part is extremely tenuous as to the vulgar language question, the reason being that plaintiff's ward suffered no injury of any consequence. The question is therefore largely academic. The plaintiff and his ward may well have no standing but the Court, in an abundance of caution, will not find that plaintiff and his ward lack standing as to this issue and the Court will proceed to the merits.

[¶10.]   The core of this lawsuit might be conceived as presenting issues under the First Amendment. The speech here had no political or social message of any kind. It is, however, somewhat understandable why plaintiff and plaintiff's ward may have experienced some frustration with what occurred. The student was "talking to herself" in an office setting with only one other person present. The better course of valor may well have been for the secretary to have strongly reminded the student of the rule and to have told the student, a very good student, to not repeat the conduct. After all, not every speeder on the highway receives a citation. Law enforcement officials, even in the face of a clear violation of the law, do not arrest every person or issue a ticket every time. Even judges (other than in federal court where we are shackled with the Federal Sentencing Guidelines) show mercy. The conduct was certainly not disruptive to the educational environment or to other students or faculty. The violation was perhaps too much to do about relatively little. Having said all of this, however, the rule was clear; the rule was well known to the student and the student, without dispute, violated the rule. This rule was a "zero tolerance" rule. Without addressing serious questions as to the mindlessness of some zero tolerance rules, the office secretary may, of course, have perceived it to be her duty to report

4

every rule violation, regardless of how minor. Once reported, the principal would have no choice but to follow the rule as established by his employer. We know there is a case in the Eighth Circuit where a teacher was terminated for not enforcing the rule of the school board as to the use of profanity on school property and the dismissal was upheld by the courts. *See* Lacks v. Ferguson Reorganized School Dist. R-2, 147 F.3d 718 (8th Cir. 1998). In Lacks, the holding was, in part, that the school district had, as a matter of law, a legitimate academic interest in prohibiting profanity by students in their creative writing, regardless of any other competing interests.

[¶11.] "Although students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,' *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506 (1969), the Constitution does not compel 'teachers, parents, and elected school officials to surrender control of the American public school system to public school students.' *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986) (quoting *Tinker*, 393 U.S. at 526 (Black, J., dissenting)). The constitutional rights of public school students 'are not automatically coextensive with the rights of adults in other settings,' *Fraser*, 478 U.S. at 682, and a school need not tolerate speech that is inconsistent with its pedagogical mission, even though the government could not suppress that speech outside of the schoolhouse. *See Hazelwood Sch. Dist. V. Kuhlmeier*, 484 U.S. 260, 266 (1988) (citing Fraser, 478 U.S. at 685); *Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir. 1989) ('Limitations on speech that would be unconstitutional outside the schoolhouse are not necessarily unconstitutional within it.'). Therefore, courts must analyze First Amendment violations alleged by students 'in light of the special characteristics of the school environment.' *Hazelwood*, 484 U.S. at 266 (quoting *Tinker*, 393 U.S. at 506)." Henerey ex rel. Henerey v. City of St. Charles, School Dist., 200 F.3d 1128, 1131-32 (8th Cir. 1999).

[¶12.] "Purely individual speech by students constituting 'personal expression that happens to occur on the school premises' is subject to a high degree of First Amendment protection." *Id.* at 1132. The majority opinion in Henerey, to support the foregoing sentence, cited Hazelwood, 484 U.S. at 271. With all due respect, the quoted sentence from Henerey is written rather broadly in stating that "purely individual speech" by students is subject to a "high degree" of First Amendment protection. It is true, of course, that Hazelwood distinguished Tinker on the basis

5

that Tinker dealt with the wearing of armbands, described as purely individual speech. "However, school officials may restrict even individual student expression that 'materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school,' or that 'would substantially interfere with the work of the school or impinge upon the rights of other students.' *Tinker*, 393 U.S. at 509 (citations and internal quotation marks omitted)." *Id.* at 1132.

[¶13.] "When the expressive conduct at issue occurs in the context of a school-sponsored activity that is not also a public forum, the authority of schools to exercise control over the content of speech is at its greatest. *See, e.g. Hazelwood*, 484 U.S. at 276 (school may censor official student newspaper); *Fraser*, 478 U.S. at 678 (school may ban sexually suggestive language in speech before high school assembly); *Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718, 724 (8th Cir. 1998) (school may ban profanity in creative writing class), cert. denied, 119 S. Ct. 1158 (Mar. 8, 1999); *Poling*, 872 F.2d at 764 (school may ban insulting references in student council election speech). In the absence of a public forum, school officials may limit a student's speech in a school-sponsored activity if the limitation is 'reasonably related to legitimate pedagogical concerns.' *Hazelwood*, 484 U.S. at 273." *Id.* Obviously, in Milbank, students are allowed as part of the school activity to come to the principal's office to receive messages.

[¶14.] "The nature of the forum affects the degree of protection the First Amendment affords to expressive activity, even within the public school setting. *See, e.g., Hazelwood*, 484 U.S. at 267 (conducting forum analysis as first step in addressing student speech claim); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983) ('The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue.'); *Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1540 (7th Cir. 1996) (prior restraint of student speech not unconstitutional in nonpublic forum)." *Id.*

[¶15.] School facilities are traditionally deemed nonpublic fora. That is the case here with regard to the principal's office. Such an office is not a place or a "forum for public expression." It is a place where school business and activities are conducted.

6

[¶16.] A question to be addressed is whether the expression was "school-sponsored speech" or "independent student speech." "A school may exercise greater control over student speech uttered during participation in a school-sponsored activity than that expressed during an independent activity because 'students, parents, and members of the public might reasonably perceive [the school-sponsored speech] to bear the imprimatur of the school' . . . (quoting from Hazelwood at 271). "Such control also 'assure[s] that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school'. . . (quoting from Hazelwood at 271). Although to be considered 'school-sponsored,' expressive activities must be 'curricular' in a broad sense, they need not 'occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.' (again quoting from Hazelwood at 271)." Id. at 1133. Clearly, in the present case, the speech was independent student speech and had no connection with any school-sponsored activity, other than using the principal's office to obtain a personal message.

[¶17.] "The question whether the First Amendment requires a school to tolerate particular student speech--the question that we addressed in Tinker--is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." Hazelwood at 270, 271. The United States Supreme Court has concluded "that the standard articulated in Tinker for determining when a school may punish student expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dissemination of student expression." Hazelwood at 272, 273.

[¶18.] The question thus becomes: can the school constitutionally ban "profane or inappropriate language" anywhere on school property? If one were to read Henerey no further than already quoted, the answer would be "no." We do know that the holding in Lacks was that the school

7

board, as a matter of law, "had the right to establish and require the enforcement of a rule which prohibits classroom profanity in any context . . ." 147 F.2d at 724. In the present case, the profanity was used in the office of the high school principal. Again, this is consistent with the rule from Hazelwood that a school may exercise greater control over student speech uttered during participation in a school-sponsored activity than that expressed during an independent activity.

[¶19.] We know also that "the prior restraint of speech within secondary schools is not per se unconstitutional. *See Hazelwood*, 484 U.S. at 273 n. 6; *Bystrom v. Fridley High Sch., Indep. Sch. Dist. No. 14*, 822 F.2d 747, 750 (8th Cir. 1987)." Henerey at 1134. "As we noted in *Bystrom*, however, a 'high degree of generality is made necessary by the subject matter. The concepts involved (indecency, vulgarity, likelihood of material disruption) are general by their very nature.' 822 F.2d at 750." Henerey at 1134. "As the Sixth Circuit observed in a case involving a student council election, '[t]he universe of legitimate pedagogical concerns is by no means confined to the academic.' *Poling*, 872 F.2d at 762. Thus, for example, 'schools must teach by example the shared values of a civilized social order.' *Fraser*, 478 U.S. at 683 (quoted in *Poling*, 872 F.2d at 762). These shared values include 'discipline, courtesy, and respect for authority.' *Poling*, 872 F.2d at 762." Henerey at 1135. "As the Sixth Circuit put it, '[c]ivility is a legitimate pedagogical concern.' *Poling*, 872 F.2d at 758. So, too, is compliance with school rules. *See Bull*, 745 F.Supp. at 1459." Henerey at 1135. Here, as in Henerey, the student signed an agreement that she would obey school rules.

[¶20.] It is clear that, in the Eighth Circuit at least, "[s]chool districts have an interest in maintaining decorum" (Henerey at 1135) and this would certainly apply to conduct within the school principal's office, the principal being the "disciplinarian" in any school district. It is common knowledge and common sense that most vulgar language is spoken to one's self out of a sense of frustration or anger rather than directed toward others. "This Court on many occasions has recognized that certain kind (sic) of speech are less central to the interests of the First Amendment than others. Obscene speech and 'fighting words' long have been accorded no protection. *Roth v. United States*, 354 U.S. 476 . . . (1957) . . ." Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 759 (1985).

[¶21.] "School authorities can regulate indecent language because its circulation on school grounds undermines their responsibility to try to promote standards of decency and civility among school children. The task may be difficult, perhaps unlikely ever to be more than marginally successful. But whether a school condemns or tolerates indecent language within its sphere of authority will have significance for the future of that school and of its students. The First Amendment does not prevent a school's reasonable efforts toward the maintenance of campus standards of civility and decency. With its captive audience of children, many of whom, along with their parents, legitimately expect reasonable regulation, a school need not capitulate to a student's preference for vulgar expression. A school's authority to condemn indecent language is not inconsistent with a student's right to express his views. In short, the First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket." Thomas, et al. v. Board of Education, Granville Central School District, 607 F.2d 1043, 1057, (Newman, Judge, concurring in result) (2nd Cir. 1979).

[¶22.] It certainly has been "well understood that the right of free speech is never absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words . . . It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." Chaplinsky v. State of New Hampshire, 315 U.S. 568 at 571, 572 (1942).

[¶23.] One additional question must be addressed. Does Tinker teach or even suggest that any school regulation of indecent language must satisfy the criterion of a predictable disruption? This Court agrees with the concurring opinion of Judge Newman in Thomas at 607 F.2d 1055 that it does not.

[¶24.] Finally, "[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." Hazelwood, 484 U.S. at 273. This case, although it presents matters of some concern to the Court, as already expressed,

9

is an appropriate case for summary judgment. There is no genuine issue of any material fact and the defendant is entitled to a judgment as a matter of law.

[¶25.] Now, therefore,

[¶26.] IT IS ORDERED that the motion of the defendant (Doc. 9) for a summary judgment is granted and this case is dismissed on the merits, with prejudice and without the taxation of costs.

[¶27.] Dated this 1st day of December, 2000.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: _____
          DEPUTY
(SEAL)